We'll hear first from Mr. Levinger. Thank you, Your Honor. May it please the Court. This is a very significant antitrust case in which the defendant has obtained a 90 percent share of the market for veterinary insurance and used its market dominance to exclude competition from other brokers like my client, the Sanger Insurance Agency. Despite that fact, and despite the fact that this Court has generally cautioned against granting summary judgments in complex antitrust cases, the District Court below did just that only a few days before the trial was scheduled to begin, and it did so based on two grounds that do not relate to the merits, but are nonetheless very, in fact, intensive. One involves the Karen Ferguson Act exemption, and the other involves the Court, the preparedness component of the antitrust standing. In both instances, I submit that the Court misapplied the applicable legal principles to the summary judgment evidence. The MFA does not exempt the conduct being challenged here, and the evidence shows that Sanger was prepared to enter the market for veterinary insurance and, in fact, had done just that. Let me ask you, looking at your complaint, which I just got this morning, so obviously I didn't read the whole thing. I notice that the relevant market is, in the market providing insurance products to veterinarians, including large animal and equine veterinarians, the products at issue are professional liability insurance and business insurance. Is that correct? The expert, Dr. House, I think refined that somewhat in the summary judgment evidence in his report. He said that the market is really professional liability insurance sold to veterinarians. That's really the market here. There is evidence that they then used that market power. They had a 90 percent market share for the PLI insurance. Now you say 90 percent. Now let's talk about that. How many veterinarians in the United States are members of the AVMA? Sixty-five thousand vets are members of the AVMA. And how many are not members of AVMA? The record is not clear on that, Your Honor. But I think AVMA, very much like the ABA, virtually, I think there's a huge percentage of veterinarians who are members of AVMA because it is the national association. Well, but that's precisely what I was thinking about, which was the AMA and the ABA, and I think it's only 50 percent of attorneys are members of the ABA. I think the evidence was that 65,000 vets are pretty close to the number of vets in this country. There were a number of vets in AVMA who are teachers and who had retired and they weren't buying PLI insurance, obviously. But a significant percentage of the AVMA members were buying, and I think the evidence showed that from their own documents, from the documents they were exchanging with Zurich and from their own reports, that 90 percent of people who were vets who were buying PL insurance were buying it through the AVMA program. Now, with respect to the MFA, over the last 30 years, the courts have consistently narrowed the definition of the business of insurance while simultaneously expanding the definition of the boycott exception. Here though, the court did just the opposite. Why isn't this like the Ninth Circuit's Feinstein decision where the fact that HUB acts as a broker for all these people who participate in the AVMA program, that that then spreads the risk for people with high-risk practices versus low-risk practices? Why doesn't it fall within that case? Well, because in Feinstein, the plaintiff in that case was a doctor who basically said, look, I don't like the fact that I have to be a member of LACMA, the L.A. County Medical Association, in order to buy this insurance. And the argument was, well, look, we need to sell group insurance on a group basis in order to spread the policy risks. That's not what we have going on here. The problem here is not who gets insurance or the type of insurance that they get. The issue really is who gets the right to broker insurance. That's simply it. And . . . Well, let me tell you . . . well, unless Judge Costa has another roll call. I have a conceptual problem about this, because I understand . . . I mean, as I understand your complaint, which is quite different from their brief, or as I understand your brief, your brief is, you're not objecting to HUB organizing and running the PL Investment Trust for AVMA. Correct. You just want to do your own. Correct. And you want to have exclusives with insurers for TAVA or whoever else, whatever other organizations. Is that correct? Yes, Your Honor. So basically, you want to divide up the market. Is that correct? No, we simply want the right to write veterinary insurance through other state associations and programs. But as far as HUB goes, you know, the bigger the market, it seems to me, the more significant is the argument that this is a matter of risk spreading from HUB's standpoint. In other words, if only 50 percent of the vets . . . I mean, this is a bizarre case as far as I can conceptualize it, but I'll let you do the talking. Well, you're right on the first point, Judge Jones. We're not complaining about the AVMA program. We're not complaining about the policy forms used in that program. We're not complaining about HUB's right to be the exclusive broker for the AVMA program, and we're not complaining about the sale of group policies to the AVMA members, unlike Feinstein. What we're complaining about is very simple, that they use their market dominance to extract agreements from their AVMA insurers, the big four, as I call them, to not do business with other brokers like us who are wanting to sell veterinary insurance through other programs, other state association programs. And they have a lot of responses to that, and some of them on the merits, some of them related to McCarran-Ferguson, but related to McCarran-Ferguson, it seems to me logical that what they are talking about is the size of the pools in which the risk will be spread. Well, that's the argument they try to make, but I think that mischaracterizes what our for AVMA members. We're talking about on the broker's side. This is very much like the eyeball case, we call it, the insurance brokerage antitrust litigation, where there, they were, the issue was the insurers, what insurer was writing the insurance. They were dividing up the market. Well, and here. That was the argument. Well, and the court held that the reason it didn't fall within the McCarran-Ferguson Act exemption was because that case simply involved who could sell the insurance to a particular insured. Here we're talking about who can broker. That's all we're talking about. Who has the right to broker the insurance to veterinarians, and here we were excluded as a result of their market dominance and conduct from brokering insurance to other vets. Well, normally exclusive dealing arrangements aren't, you know, there was a time when they were highly suspect under antitrust law, but I don't think they are anymore. I would call this, Judge Jones, a really concerted refusal to deal, which I think ties now to the boycott. But it would be if you had a concert, but you don't have a concert because, in part, they say it is undisputed that you could have sold professional liability to small animals, small animal vets. Well, that's not undisputed. In fact, that's among some highly disputed issues in the case as to whether we, A, could sell through the ALGMA insurers who were . . . CNA. I think it was CNA and or United said they could sell you small animal vet coverage. Well, the question was a little different. I think the question to Joe Bair was did anybody tell you that they could not write for small animals, and his answer was no, they never told me that, but the evidence shows, I think at the email exchange, record 4122, I believe, that CNA came back and said, look, we're not going to write stand-alone monoline EPL, Employment Practice Liability Insurance, and we're not going to write stand-alone monoline PLI insurance. So CNA said no, the other three said no, and the reason they said no was because, as we've demonstrated in our brief with the record citations, that HUBB extracted that agreement from them as a condition to do business for ABMA. On your boycott claim, HUBB's behind it? HUBB's the actor who's basically orchestrating the boycott? Yes. Yes, HUBB is extracting . . . Don't you need concerted action for a boycott? I think the concerted action is between HUBB and its ABMA insurers, to whom they say, look, we're not going to do business with you, we're not going to let you write insurance to the other broker, and they extracted that agreement from Zurich, from Hartford . . . What I don't understand is what benefit the insurers get out of that. In other words, they're already competing with each other because there are four of them that will sell to the vets, right? Well, they're not competing with each other, Judge Jones, because they were dividing up the type of insurance that they were selling to the ABMA program. Zurich sold PLI, Hartford, with a backup of Travelers, sold business insurance, and then CNA sold EPL. But it benefited them by getting access to the ABMA program. If they didn't agree . . . Let me ask you this fundamental concept. Why are you suing HUBB and not PLIT? Because PLIT had an exclusive arrangement with HUBB for two-year periods, correct? Terminable at will. In a manner of speaking, yes, although they've been doing this . . . And HUBB ran the program. HUBB wasn't just a broker. It ran the whole program. So why isn't PLIT the real culprit here instead of HUBB? Because it's not PLIT that's extracting the agreements from the insurers to not do business  HUBB is the agent for PLIT, aren't they? I'm sorry? Isn't HUBB the agent for PLIT? HUBB, I think, describes itself as the partner of PLIT. They've been partnering with ABMA, PLIT. It just seems to me like a fundamental . . . you're really slicing your defendants as narrowly as possible. You're not suing the insurance companies because you don't want to offend them, and you're not suing PLIT because you don't want to offend the vets, and so, you know, you just . . . very arbitrary. I think it was a responsible pleading, Your Honor, by honing in on the defendant who was ultimately culpable, sitting at the top, extracting these agreements. Well, I mean, again, I never heard of a broker being at the top of an insurance . . . of the insurance pyramid. This is just upside down to me, but . . . It's an unusual case, but I think it's unusual because of the nature of the ABMA PLIT program. And I'm going to give you some extra time because I've been . . . Well, that's fine. I appreciate that. Just continuing on the MFA and whether it involves the business of insurance, I mentioned that it does not involve the transferring or spreading the policyholder risk. We're not dealing with the policyholders. We're dealing with simply who has the right to broker the insurance. That's it. The conduct is not an integral part of the policy relationship between the insurer and the insured, which . . . But by having this single broker, which is HUB, that's making sure they channel it. As you said, Zurich does the malpractice, I think. Hartford does some other types of policies. Doesn't that help ensure that all this mass pool of vets go to single insurers who can have this broad-based risk pool? I think there are certain benefits to writing insurance on a group basis, to be sure. But again, we're not challenging . . . we're not complaining about the ABMA PLIT program. We're not saying we have a right to participate in it. We're not claiming that there's some problem with . . . But isn't it obvious that there's a difference between a pool of 65,000 vets on one hand and the 250 or 300 vets in the TIVA on the other hand, from the standpoint of . . . I mean, if all you're talking about is equine vets in Texas, well, presumably the drought afflicts them all at one time or a disease afflicts them all at one time. That's a relatively small pool compared to what you're talking about nationwide. Well, we simply wanted the right to broker insurance for that relatively smaller pool of 300 TIVA and then expand to different organizations in other states, including the American Association of Equine Practitioners. But I think the point is that your question, I think, really goes to the merits. And Royal Drug says in footnote 5 that we're not to conflate the merits with the question of exemption. I mean, you can have . . . Well, yeah, but it goes to the risk pool idea, which . . . Well, I think the Court would be . . . And also . . . I think the Court would be right if we were challenging the ABMA PLIT program itself, sort of like in Feinstein, and saying that we had the right to be the broker there. That's not our complaint. We're simply saying that they had no right, HUB had no right, to extract agreements from the four major insurers for veterinary insurance. I don't think HUB's arguing this because they're basically denying factually that they did extract those agreements. But it does seem to me even that activity could assess the risk pool, because if all these vets start getting insured through their state group plans, through their state vet associations, and there's fewer people doing it through AVMA, and that changes the risk pool. But, again, I don't think they're necessarily arguing that because they're denying that they engaged in this exclusive dealing or, as you describe it, coercion. Yes, I mean, they deny it, but I think there's ample summary judgment evidence to the contrary that they did. But their risk pool is their risk pool, but we're talking simply about the right to sell insurance through insurers, have access to their insurers to write insurance for others. Why don't you move on to the readiness to enter the market? The preparedness issue? Yes, sir, because the problem I have, or the questions I have, I haven't formulated an opinion, surround the JACO case. Yes. And, you know, it would seem to me a pretty penetrating analysis of the readiness to enter the market, and here you've got an undercapitalized organization. If what you are trying to become is the plit for equine vets, it wasn't at all clear to me that you had gotten the resources together or made the contact or even set up some kind of proposals for which you could deal on a group basis. Well, I disagree with that, Your Honor. I think the summary judgment evidence does amply support each one of the factors. JACO involved a very capital-intensive investment that was needed along the lines of some of these cases where the contemplated business expansion required the acquisition of a very expensive asset, like in that case a number of printers to sell at a state or a pipeline or a shopping center in one case. Well, how many equine vets are there? If your market is the United States, how many equine vets are there? I don't know the records. Thousands. Probably so, but the plan, again, was to enter gradually through one association, TEVA, and then expand beyond that, and the capital investment needed to do that was, the evidence showed, minimal. Dr. House testified that we simply needed to add a couple of people to an already existing, flourishing insurance agent that just didn't happen to be in the veterinary business. But the point I really want to emphasize is a piece of evidence the Court completely overlooked, and that's HUB's own recognition of the fact that we were prepared to enter the market and, in fact, had entered the market. Well, I'm not sure whether that's relevant. In other words, it is often the case that a competitor will misperceive the other party, I mean, just like in foreign relations or anything, you misperceive the other party's strength or weakness, so it's not clear to me, and JACO doesn't rely on anything like that. It may not have been a factor there, but I'd like to see a case that held that was relevant. Well, the Newman case out of the D.C. Circuit held that, Your Honor, and I don't think that the JACO case addressed that factor because it wasn't an issue, but I think it's very important. HUB is very experienced, and they know the difference between a dreamer and a real threat, and they perceived, they recognized us as a threat in Texas. I would refer to the Court to the April 2012 e-mail where they resisted a rate increase in Texas because of concern that that would drive that vet and potentially others to a new program brokered by us. Well, depending on where you sit, that's either anti-competitive or pro-vet. Well, in that one instance, it did lower the premium, but unfortunately for the other 36 who were the subject of a similar rate increase, we don't have the same evidence that they opposed that rate increase. So, yes, I think it does demonstrate that the presence of another program would drive down rates. I think that supports what we're saying, and they were concerned about that, and they were concerned that if the rate increase occurred, it would legitimize another program in Texas. Could another vet, give him an extra two minutes, could another vet, could an equine vet go out on his own and purchase professional liability insurance apart from AFMA? We were selling, Sanger was selling for a time, business insurance to individual equine vets or clinics, and with an endorsement, we're getting them PLI, professional liability insurance. But that was a far less adequate product than being able to sell stand-alone, monoline. Why is it less adequate? I can't answer that, Your Honor, because I'm not an insurance expert, but that seemed to be the testimony of Joe Baer, that the preference was to be able to sell on a stand-alone, monoline basis, and that was the request that he had made to CNA, and they said no, as well as the other three insurers. So endorsements, I think, are less satisfactory, less adequate than being able to sell on a stand-alone basis. Again, the major way for vets, the channel of distribution they were routed to here was AFMA PLIT. No problem with that. It's just that they should have the right to be able to choose and have the right to choose another channel of distribution, and that's what we were trying to offer but for the fact that we didn't get access to their insurance. The antitrust injury issue is really also related at the end to damages, and even if you can get over the preparedness hurdle, what kind of damages can you get? Because there's obviously a good degree of speculativeness when the business was really never up and running. I guess we'd like to get the chance to surmount that hurdle, but we didn't. But Dr. House put on a damages model that basically applied the yardstick method to market share and came up with a multimillion-dollar damages model. They attacked that, to be sure, but that's going to be an issue we'd like to deal with on remand because we think it's a valid damages model, a valid antitrust injury. You stated that your refined market definition is the market for professional liability insurance for all vets or just equine vets. I think Dr. House defined it as all vets. Professional liabilities for all vets, and was it in Texas or the Southwest? What geographic market? Yes. He excluded five states. I want to say it was California, Pennsylvania, Oregon, Hawaii, and Alaska. Forty-five states then? Yes, although the idea of the- Yes. Okay. Although, as I say, the idea was not to get there immediately. It was an incremental plan that they would roll out state by state. Right. Unless the Court has any further questions? Not at the moment.  Ms. Sterling? May it please the Court. I'm Deborah Sterling. I represent HUB International and HUB International Midwest. HUB requests that the Court affirm the judgment in all respects. What I'd like to do is start with the boycott issue, move to the business of insurance issue, and then on to standing. Under Hartford Fire Insurance, a boycott is a concerted refusal to deal on a collateral transaction to coerce terms of a primary transaction. But Justice Scalia pointed out in that opinion that if the collateral transaction relates to the primary transaction, it's not a boycott. And the challenged activities in this case directly relate to the primary transactions between HUB and each insurance carrier and between each insurance carrier and its respective insureds. That's because what Sanger asked for was access to the program policies, rates, and underwriting guidelines. Well, see, they say they totally disclaim that in their briefs. They're experts. They say in their reply brief that you are mischaracterizing. And frankly, when I read these briefs, I thought you were just talking right past their fundamental arguments. The record shows that Joe Bair emailed these insurance carriers and asked to access the same coverages that HUB had. And why can I not do the same? In relation to traveler's insurance, for example, and I think that's a record on Appeal 4211, I believe, he specifically asks regarding access to these policies. But with regard to the professional liability insurance, their expert testified repeatedly that it is the Zurich professional liability insurance product to which a broker must have access in order to compete with HUB. I mean, it's very clearly the policies at issue in the program. Well, but maybe you're arguing at different levels of generality. Because if I'm a doctor, I have the Hartford, for instance, long-time provider of medical insurance. But that doesn't mean that every doctor's medical professional liability insurance policy is exactly the same, does it? No, it does not. And, in fact, in this case, the record reflects that the program policies, which offer higher limits and enhanced coverage, are different than the non-program policies that the insurers offer. In the non-program policy, the professional liability insurance is written as an endorsement to the business package policy. And, in fact, Zurich offered to JoBear on May 4th of 2011, Vera Patten at Zurich wrote to JoBear and said, we will write small animal and we will write professional liability as an endorsement to that bought product. The other insurance carriers also have P.L. endorsements. So as of ‑‑ But they're lower, what are you, higher deductibles or something like that and lower coverage? It is ‑‑ the program policy offers higher limits. It offers coverage for things that are not necessarily covered under the other policy. That would be Animal Bailey and things like that. One of the main criteria of the policy, the program policy, is that there's no hammer clause. Under a professional liability policy, ordinarily the professional can, you know, approve or disapprove a settlement. A hammer clause would put some liability exposure on that vet if the insurance carrier could have settled for a lesser price, but the vet said no. One of the draws for the hub policy is that it does not contain that hammer clause. So those are the types of differences that exist in those policies. Where is that in the record? That is in the ‑‑ well, Dr. House discussed it somewhat in his deposition and in his report, claiming that the hammer clause is somehow critical to the professional liability insurance for vets. The hammer clause is also mentioned in parts of the record where hub is negotiating with insurance carriers for the parameters of the coverage. But the access to the policies in this case, even if Sanger wasn't asking for access to the particular program policies, these challenged activities would still relate to the primary transaction and for some of the reasons that Judge Costa has mentioned. You know, for one thing, for example, in the case of Zurich, hub brought Zurich the policy form that already existed for the AVMA program. They brought loss control data. They brought underwriting suggestions. They helped to formulate that program. In exchange, Zurich agreed contractually not to use that data, not to use those forms, and not to use the rates that are actuarially tied to the AVMA group for other brokers and outside sales. If Sanger had access to that professional liability insurance product, essentially Zurich and Sanger are taking confidential data that Zurich has contractually agreed not to use to compete, in Zurich's case, with its own insured because the AVMA is the insured under the PL policy issued by Zurich. It's a master policy. Well, suppose you don't get to that point because I go back to the idea you did not explain in your brief all this about the distinctions, nor did they, frankly. But they just say they're a broker. They want to be able to go to these companies and negotiate a group rate. Why can't they do that? There's nothing preventing them from doing that. And, in fact, that's what hub and the AVMA did when they had to go find a new insurer. They took their group— Well, except for the fact that they say, they allege, that hub told these others don't deal with Sanger. Well, the record shows that each of these four insurance carriers agreed to write veterinary insurance for Sanger. All of them agreed to write small animal vets. And according to the record, the AVMA data shows that that's 77%, 78%. Well, so you don't disagree that right now AVMA or the AVMA plate handles 90% of all veterinarian professional liability coverage? Well, in fact, we do disagree with that. To answer your question from earlier today, and I'm not sure that it's in the record, but there are over 100,000 vets in the United States. Of those, there are about two-thirds that are AVMA members. And the AVMA publishes this data publicly every couple of years. Of those, there are some that buy professional liability insurance and others that go elsewhere for coverage. Because we have to remember that there are other companies out there, and Joe Bair acknowledged in his deposition, as did Dr. House, that the PL is available as an endorsement to the BOP. So it's not that Sanger didn't have access to any professional liability coverage. That's just not accurate. On McCarran-Ferguson, I mean, what you were saying a few minutes ago is how I took your brief, which is you're saying this argument they're making that you were coercing the insurers not to write insurance with Sanger or other brokers outside of the AVMA program. For McCarran-Ferguson purposes, don't we have to view it in the light of their allegations and then say whether that would implicate this business of insurance? And I guess that's where I'm not really seeing you articulate a rationale for how the allegations as they characterize them would implicate this risk-spreading goal. Well, and let me point out that the record reflects that HUB spends hundreds of thousands of dollars a year on advertising and marketing, not just of that program but also of the four insurance carriers. So to the extent those four insurance carriers are free-riding on the advertising done by HUB and the endorsement of the AVMA, they're essentially taking that program data and competing with that program. But each insurance carrier, and particularly in the case of Zurich, which is, strictly speaking, a purchasing group, each vet that it pulls out of that program changes the makeup of the group and consequently changes the risk profile of the group, which is directly tied to the demographic. So competing with that program by using the marketing that's supplied by your insured and diluting the risk pool in doing it directly affects the primary transaction. What if they did a state program through the Texas State Agency with Zurich, so it's still Zurich? I mean, at the end of the day, it's the insurer who cares about the risk, not the broker, right? Yes, and I'm not sure I understand your question. Well, they're saying they can't do deals with Zurich through the Texas State Vet Association. If Zurich was doing it as Sanger being the broker through the Texas State Program, I mean, Zurich's still dealing with the same risk pool, even if they're stealing some people, I guess, out of the national group. Well, actually it's not because it has contractually agreed not to use the program data. So in order to have a new group policy, according to Tim Hammond at Zurich, they're going to have to go through the whole analysis for the new group, and where is that data going to come from if that group, because these insureds are coming from the AVMA risk pool, so they're going to have to have enough background in history to present loss data for Zurich to act on anyway. Well, you have a questionnaire for each of the vets who are going to sign up. Well, and that's part of it. But, you know, the idea that the challenged activities here don't relate to the primary transactions is just inaccurate because it clearly does relate to the spreading of risk over the risk pool of the AVMA. The business and insurance portion of the case, you know, the gravamen of the complaint is that Sanger can't compete because it can't access these program policies. And so the choice of broker dictates whether you get the non-program policy or whether you get the program policy. I really, I mean, they keep saying that they are not trying to poach your policies. Now, what you seem to be saying is that in effect they can't compete because they can't poach your policies, but that doesn't prevent them from trying to put a group together, right? They can try to put a group together, and in fact that's what they ought to do according to their expert and according to travelers and according to firemen. There's no pleading or . . . I can't believe this case was ten days away from trial, but that's another issue entirely. But, I mean, there's no pleading or acknowledgement or concession from their side apart from their expert saying that you had to in effect have the Zurich plit policy, right? Well, Joe Baer asked for those policies. Well, he might have asked for them. Right. Well, I would too if I was making an offer, if those appear to be the best things going, but then I'd make my own offer. Well, but those are the only two choices was the hub program policies or the non-program policies because Joe Baer testified in his deposition they did not come with a proposal for a new policy. And if, in fact, they had, they would have had to go through the risk analysis, go through the ratings, go through the approval process with each state. Well, does that bear on McCarran-Ferguson or does that bear on . . . I mean, it certainly bears on the merits, but does it bear on McCarran-Ferguson or preparedness to enter a group market? Well, it bears on . . . truly it bears on the standing issue because, you know, what Sanger did was make some phone calls and have some lunches. They didn't have a group lined up. They were in preliminary discussions with TEVA. And instead of getting a group together and going to an insurance company and saying, you know, here is our group, you know, here is our loss control data, will you write a policy for us, they went to the insurance carriers and said, hey, will you write some equine, which is the highest risk subspecialty in the business, without any further support. They did not attempt to create a new policy for their own group. They were simply trying to tap into the existing policies, and their choices were program or non-program. I have a couple of questions about your alternative grounds for affirmance, which is both market share, the market share issue or geographic market issue, and then just liability. I think you just spend about a page or maybe two pages on each of those issues, which are typically very complicated issues. I mean, what kind of basis do we have with no district court record, no rulings on the admissibility of expert testimony or not, to rule in the first instance on those fairly technical areas? To the extent the information is included in the summary judgment record or the expert motions, that would be the support. So we would have to decide in the first instance whether the expert testimony would survive the Dauber challenge? I believe that would be the first step. He's a trial judge. He can do it. Back to the business of insurance, the selection of a broker and the authorizing of an agent to solicit a group policy or an individual policy falls under the business of insurance as described. Well, they cite a bunch of cases where fights among brokers and brokers and insurers have been excluded from the McCarran-Ferguson Act shield. The majority of those cases deal with situations where a broker was leaving and took confidential information or they were coaching employees or things of that nature that are outside the scope of what we're talking about here. What about Judge Sirica's fairly recent ruling in the Third Circuit, the In re Brokerage case? I think it's the main case they rely on. That case. The Third Circuit. That's a big rigging case. It's a big rigging case. There were bilateral horizontal agreements between brokers on one level and insurers on another to divide the market between the insurance carriers. That's not what we have here. We've simply got an agency agreement for HUD to act. Zurich is getting the liability, the professional liability policies. Other people are getting the workers' comp policies, and it does seem like it's allocating the market among insurers. Maybe that's perfectly permissible, but for McCarran-Ferguson Act purposes, that's where the Third Circuit recently said that doesn't implicate the risk allocation that the Act's focused on. The Owens case does indicate that this type of arrangement, the exclusive agency agreement with a broker, does implicate risk spreading and does implicate the business of insurance. And that's because it directly affects the risk spreading through that broker. But then international business comes back and says that's not necessarily that. They say that's distinguishable. International. I'll find it. Go ahead with your argument. I'll find what I'm talking about. Well, even in the INRI insurance brokerage antitrust litigation case that Sanger has cited, it pointed out that accepting or rejecting coverages tendered by brokers is best referred to, you know, attempts by insurers to discriminate among brokers based on the type of policy tendered. That's the business of insurance, and that's the complaint that Sanger makes, that they couldn't, you know, that they're not able to access a particular type of policy that falls within the parameters of both Owens and the INRI insurance brokerage antitrust case. Well, what they say is we cannot conclude that the alleged agreement has the effect of transferring or spreading the risk, and then they later say, that's Royal Brugg. Okay. Nor does this alleged conduct fall into any of the categories of the business of insurance we set forth in Owens. The alleged agreement does not involve rating schedules or rating classification differences, nor does it involve authorizing agents to solicit particular types of policies. The final category, Owens category, quote, accepting or rejecting coverages tendered by brokers, may seem at first blush to describe the alleged behavior, but in the context of Owens, quote, accepting or rejecting coverages tendered by brokers, close quote, is best understood as referring to attempts by insurers to discriminate among brokers based on the type of policy tendered. And what they're saying is that they were tendering a type of policy, which was a group, they were hoping, a group policy. And your main argument is that the facts don't support that. Your argument is not that they're not alleging that, which would pull it into McCarran-Ferguson. You're just saying the facts don't support that. Well, but we're also saying that even if they had tendered a group, whether or not an insurance carrier accepts or rejects that coverage is part of the business of insurance, as described by Owens and in reinsurance brokerage antitrust litigation. You know, one of the things about that Third Circuit case in reinsurance brokerage is that the risk had already transferred in that case. Those were policies that had already been written to insureds, and when they came up for renewal, the insurance carriers were refusing to bid or were rigging the bid so that in conjunction with the brokers, the market was allocated among insurers. That in no way approximates our facts in this case. I think we have your argument. Thank you. Mr. Levinger. Much of what we've heard consists of disputed fact issues, and I think Judge Costa is right that the McCarran-Ferguson Act, among other things, including the preparedness component, are fact-intensive issues where the inferences must be drawn under the Toland case in favor of the non-movement. And I think the argument— Just as to the McCarran-Ferguson issue only, what would you say are the disputed facts? What do you contend that is disputed by HUB? Well, I think a lot of it comes down to the characterization of the conduct being challenged. But that's a legal question. That's not a fact issue. Specifically, one side says the traffic light was red and the other side said it was green. What is your disputed fact as to McCarran-Ferguson? Well, one issue I think is the argument they're making is that none of the four insurers said no, that they were willing to write the insurance, and that's highly disputed. The evidence shows, and we've cited it, given the record citations on page 12, that the big four, the admin PLIT insurers, indeed were saying no. All right, but how does that, assuming that fact issue exists, how does that matter in terms of whether this is the business of insurance? I think that goes to the argument of whether there's transferring or spreading of policyholder risk, because what we're saying is that it has nothing to do with who gets insurance. The vets are going to get their insurance. What it has to do with is the right of a broker to sell insurance, and that does not involve the integral to the policy relationship between insurer and insured. It doesn't even relate to the underlying policy behind the MFA to begin with, which was cooperative rate-making efforts. How would you send this? You can't send McCarran-Ferguson Act to the jury. Is there any reported case where anything about that has ever gone to a jury? The boycott exception is something that may go to a jury, and I think that there's ample evidence here that there was a boycott within the meaning of the MFA. Essentially, HUB was saying to its insurers, look, we're not going to do business with you unless you refuse to not do business with any other brokers wanting to sell through any other program. As I read Royal Drug and the other Supreme Court cases, the initial issue of whether you would fall within the exemption, it doesn't even get to the evidence that you might have in your favor. It's an issue of what the allegations say. Yeah, I agree with that. I think probably the fact issues go most to the boycott exception, and I think there are cases we've cited some in our brief that talk about the boycott exception in terms of being a fact issue. I know that the Owen case that they mentioned, the dissent was saying, look, you cannot conclude as a matter of law here that the conduct being challenged fits within the MFA business of insurance, suggesting to me that you have to look at the evidence in the light most favorable to the non-movement. In terms of the boycott, I think this case fits precisely within the Eastern States Retail Lumber case, which Hartford described as a classic commercial boycott, because there you had retail lumber retailers saying to the wholesalers, look, we're not going to do business with you if you continue to be selling to our end users. And that's exactly what we have here. Hub told their insurers that they wouldn't be allowed to write insurance for the ABMA PLIT program unless they agreed to not write insurance for other brokers wanting to do competing programs. On the standing or preparedness issue, Judge Jones cited JACO, and there's a couple other cases from our circuit finding a lack of preparedness. What's your best case finding preparedness that you think fits here? I think the two best cases are the Hecht case out of the D.C. Circuit and the Newman case out of the D.C. Circuit. We don't have any Fifth Circuit cases. We have one written by Judge Jones, I think, that presumed preparedness, but then went on and ruled on a different issue. I'm not going to rely on that case. But I think Newman and Hecht are very close cases, particularly Newman. JACO, the other cases, Martin, I think are highly distinguishable because there the contemplated business expansion required the acquisition of a very expensive capital-intensive asset. Let me ask you, though. I'm looking at footnote 23 of the district court opinion, and it says, Joe Baer explained in his declaration that Fireman's Fund was not interested unless we had an existing book of business with at least $1 million in gross premiums. He also stated that CNA agreed to underwrite professional liability insurance for a few equine and large animal vets through Sanger. Now, I presume, on the first point anyway, Fireman's Fund is not interested unless we had an existing book of business. Wouldn't that go to preparedness? Because it stands to reason that an insurer is not going to look at a group discount or a standalone policy at all unless you had said, you know, it's not worth their trouble to conceive of one unless you've got a book of business lined up, and you didn't have a book of business. Well, several answers to that, Judge Jones. Number one is Fireman's Fund was just one particular insurer. They were largely riding out in California. I don't think they represented the views of other insurers and certainly not of the big four. There's no similar indication that they needed a book. They just weren't. Why was that not the big four to write professional liability? Well, because the evidence, I think, was hotly disputed and showed that anybody else who was willing or able to write veterinary insurance, and there weren't very many of them, what they were willing to write was either not available or just not adequate. It was the four who were the primary ones, and we know that because HUB selected them to write veterinary insurance. So this really is backing into their argument that you wanted exactly the same deal that Plitt had. No, we just wanted access. I disagree completely that we needed access to their policy forms and their underwriting. We simply wanted insurers, Zurich, Travelers, CNA, and Hartford, who didn't say no because HUB is demanding exclusivity. And, again, the citations on page 12 show that. I see my time is up. I don't know if this Court has any further questions. Yes, Your Honor. Thank you, Your Honor. Okay, thank you.